## No. 2776.

### JOHN HALLIDAY *v.* A. LANATA.

Where the judge of the District Court was of opinion that the verdict of the jury was in direct and flagrant violation of law and evidence, and in utter disregard of his charge, he should have set the verdict aside and granted a new trial, as asked for.

It is impossible to sanction the practice, become too common, that an inferior judge should sign a judgment which he believes and avers to be wrong, in the hope that this court will set it aside.

Where counsel for appellee complained that, before this court should have set aside the verdict of the jury and remanded the case, it should have decided that their finding was erroneous;

Held—That there was force in this criticism of the decree, and that a rehearing should be granted as prayed for.

APPEAL from the Sixth District Court, parish of Orleans. *Cooley,* J. Trial by jury. *Fellows* and *Mills,* for plaintiff and appellee. *Roselius* and *Philips,* for defendant and appellant.

MORGAN, J. In the record we find the following extract from the minutes of the lower court:

"Alfred Philips, Esq., of counsel for defendant, moved the court that said defendant be allowed the following order, to wit:

"On motion of C. Roselius and Alfred Philips, of counsel for defendant, it is ordered, that plaintiff do show cause, on ——— next, the ——— instant, at ten A. M., why a new trial should not be granted herein, on the grounds filed.

"Whereupon, the court, for oral reasons assigned, considering the verdict of the jury to be in violation of law and the evidence, and in direct and flagrant violation of the charge of the court to the jury, and for the purpose of expediting justice by appeal to the Supreme Court;

"Ordered, that said motion be overruled, and the new trial asked for be refused."

If the judge of the district court was of the opinion that the verdict of the jury was, as he says it is, in direct and flagrant violation of law and the evidence, and in utter disregard of his charge, he should have set the verdict aside, and granted a new trial. A different jury might render a verdict in accordance with law and equity, and which may be satisfactory to both parties. It is as much the province of the district courts to set aside the verdict of a jury when contrary to law, as it is

ours; and we can not sanction the practice, become too common, that an inferior judge should sign a judgment which he believes, and avers, to be wrong, in the hope that we will set it aside. It'is as much his duty to see justice done between the parties litigating their rights before him, as it is ours. Why he should render a judgment which he knows to be wrong, any more than we should, we are at a loss to imagine.

It is, therefore, ordered, adjudged and decreed, that the verdict of the jury herein rendered, be set aside; that the judgment of the lower court be avoided and reversed, and that the case be remanded to the lower court, to be proceeded in according to law; appellee to pay costs of appeal.

---

### ON REHEARING.

MORGAN, J. When this case was submitted to us some time ago we remanded it, upon the ground that the judge *a quo*, although he signed the judgment, declared the verdict of the jury upon which it was rendered in direct violation of the law, and against his charge. Counsel for appellee complained that before we set aside the verdict of the jury, we should have declared that their finding was erroneous. We thought there was force in this criticism upon our decree, and granted the rehearing prayed for. We now embark upon the labor which it is our duty to perform, and shall proceed to dispose of the case upon its merits.

Plaintiff alleges that in July, 1869, Lanata, under an order of attachment, seized upon his marble and granite works, situated at the corner of Girod and St. Charles streets, taking corporeal possession of the same, and of all the stocks, implements and chattels therein contained; that this order of attachment was procured by Lanata's making oath that petitioner was about to convert his property into money, so as to place it beyond his reach, and that he was his creditor for $604 15, adding that "he had been credibly informed and verily believed that Holliday had, since the maturity of the note sued on, declared that it was his intention to sell out his establishment and leave the country." He avers that at the time of making these charges, Lanata was well aware that they were utterly devoid of foundation, and that on the contrary plaintiff was on the eve of extending his business, by opening a most valuable quarry of marble in the State of Alabama, the product of which, when once known in this market, would almost completely supersede that imported from Italy, inasmuch as the same quality of native marble could be sold at a profit for half the price of the foreign; that he had, without the slightest reserve, communicated his project to Lanata, and had even submitted to him samples of the

several qualities of marble produced by the quarry which he proposed to exploit, and that it was not for the purpose of securing the claim against petitioner which caused Lanata to take out his writ of attachment, but that it was obtained in order to preserve and maintain his valuable monopoly of the importation of Italian marble by crushing the rival enterprise of the petitioner; that upon a rule to set aside the attachment, the malice and bad faith of Lanata were made fully apparent, and the order was accordingly rescinded; that by the false and calumnious charges made under the sanction of his oath, and at the peril of pecuniary responsibility, Lanata has so far succeeded in shaking the credit of petitioner as to compel him to suspend his business, dismiss his workmen, and has involved him in the greatest embarrassment for the fulfillment of his various contracts; that the direct and immediate damage to him, so far as he had ascer'ained when he filed his petition, was $7000, and he avers that as indemnity to his credit and standing, eventual loss of profits and of time, annoyance and expenses of litigation, the further sum of $15,000. He asks for a judgment for $22,000.

The defendant filed a general denial.

There was a verdict and judgment for the plaintiff for seven thousand dollars ; and the defendant has appealed. The plaintiff has not asked that it be amended in his favor.

There is no doubt that Halliday owed Lanata $607 35. To the petition filed against him, in which this sum was claimed, he made no answer, and judgment by default thereon was rendered and confirmed against him, and there is no evidence in the record that this judgment has ever been paid. But the record does contain the sheriff's return upon the *fi. fa.* issued thereon, which is in the following words : "Received, December 4, 1869. Nothing realized after due demand made of defendant, who answered, no money, no property."

Lanata's suit was filed on the thirtieth of July, 1869. The writ of attachment was issued on the same day, and on the second of August the contents of the marble yard, corner of St. Charles and Delord streets, were seized by the sheriff; on the twelfth of August they were released, defendant having given bond ; and on the twenty-first of August the attachment was set aside by the court from which it issued.

The note upon which the suit was brought was dated the eleventh of March, 1869, payable thirty days after date. The petition was filed on the thirtieth of July.

The plaintiff has been living in this city twenty-three years, and, at the time the attachment was sued out was engaged in working marble, granite and stone of all description. The attachment of his property, he says, completely broke him up in business, and caused him immediate damage in the sum of eight thousand dollars, loss of profit,

which he would have made on several pieces of work which he had on hand, and which he was unable to complete.

He was the owner, as he says, of four hundred acres of land in Taledega county, Alabama, upon which there is a marble bed, elevated out of the valley about two hundred and seventy feet, a solid mass of marble, extending down the valley one mile, "and is about half a mile wide before it pitches in the mountain on the other side." He considers it a much finer quality of marble than the Italian, as it is, according to Professor Tournay, of Alabama, pure carbonate of lime, which constitutes the finest quality of marble; it contains only one trace of silica, while there are several traces of silica in the Italian marble. There are several kinds of marble in the bed; blue, black, green and white. The black is fully equal to the Irish marble, and the green is equal to the marble called verd-antique, and takes as fine a polish. There is also a quarry of common flag stones in the same tract. His intention was to supply the city with marble and building material, and to aid in this purpose he was (when testifying in this suit, twenty-eighth of January, 1870) having a tow-boat and barges prepared to fetch the marble here. His chief depot was to be at the New Basin. He was to have, besides, a depot in New York, and one in St. Louis. The marble, he says, could be sold for thirty per cent. less than the Italian marble. Flags, coming from New York, would cost about $3 50 a yard, while those from his quarry would cost about fifty cents a yard. He was offered, he says, $70,000 by capitalists in New York, for a half interest in his quarry, or, rather, they offered to put in that amount to work the quarry, but whether or not he accepted this proposition does not appear. It is probable, however, that he did not accept so low a price for his property, as, estimating what quantity of marble might be produced from it, he says: "I believe the marble business in Vermont amounts to $3,000,000 per annum; and these quarries are more extensive and more easily worked, because it is a surface quarry, and the others have to go down seven hundred feet to get the marble, and to mine underneath the earth." He would not have been apt to have sold the half of so large a property for so insignificant a sum as $70,000.

Now, Lanata was also in the marble business. He knew of the plaintiff's quarry; he was informed of his intentions regarding it; and, according to the plaintiff, it was to get rid of so formidable a rival, that he instituted these attachment proceedings against him, which, as he says, completely broke him up.

If this be true; if Lanata caused him this great damage; if the attachment of his property was made without just cause and without the authority of law, Lanata was wrong, and the damage he has caused he must repair.

We can not agree with the plaintiff as to the damages he alleges he

has sustained. He claims that when the attachment issued he had contracts on hand which would have netted him $8000. The contracts he has positively sworn to are, first, one with Willoz to build a tomb for $5200; second, one with the Ladies' Benevolent Association for $3200. He says he had others for mantels, etc., for various parties in this city, and some work for persons living in Mississippi, but with the exception of the partner of a Mr. Salter, he gives neither names nor amounts of his contracts, and he does not say how much this party was to pay him. The contracts which he has established amount to $8400. To enable him to earn $8000 on them they would have been almost all profit. The contract with Willoz was in the winter of 1868, and was to be finished in three or four months. He purchased the material in New York, on a letter of credit ,from Davidson—except about $800—who was his associate in the matter, and when the materials were shipped they drew drafts for the price thereof on Davidson. Portions of the work were to be paid for as the work progressed. Being asked how much he has received on account of this work,. he says he does not recollect; being asked how much is due on account of the .work he says he does not recollect; says he does not know whether he will be paid anything or not; that he is en- tirely at his mercy, as the contract has expired. Being asked when it expired, he says he does not recollect; says he thinks the work was to be completed by "All Saints' Day," but being pressed with the question, "the contract had expired, then, previous to August, 1869?" he answers "yes." Now, as Lanata's attach- tachment was only levied on the second August, it necessarily follows that he did not lose anything on that contract by reason of Lanata's attachment. Besides, he testifies that the work was going on under his direction when the suit was being tried. With regard to the con-- tract with the Ladies' Benevolent Association, he says he should have made a profit of $1500. The total he was to have received for the entire work was $3000 or $3290. Being asked how much he had re- ceived on account of this work, he answers, "$500 is all I received." But he says that he gave Davidson orders for money on this contract. Being asked how much Davidson received, he says he does not know, but he thinks he received something like $2000. If the contract, then, was for $3290, $900 remained due on it.

Then he had a flight of steps to make for a lady who lives some-- where in the neighborhood of Carrollton. But where she lived exactly he could not tell; neither did he know her name, nor whether she was married or single; nor does he say what he was to receive for the work, nor that it was ever commenced. Being asked what became of the steps, he says the stone is "laying around the yard; laying out in the burying ground." Being asked what the material was doing in

the burying ground, he says part of it was attached to some of the other material to build a tomb with, from which it had to be split off; that it was never hauled away; and that he never did any work on the steps. It is difficult for us to see how Lanata's attachment could have interfered with the profits which he expected to realize from this work.

It seems that he had another contract with one Roberts for $1650. But this contract was entered into in 1868. The work is not finished. At first he does not recollect when he commenced it; thinks it was commenced about eighteenth June, 1868; some of it was done while he was in partnership with Robertson. He continued to work " until all the stuff he had on hand was used up." Then, he says, he could not continue the work because he could not get means to pay the hands. Being asked how much money he had received on this contract, he doesn't recollect; nor does he recollect when the first payment was made. We do not see that Lanata's attachment caused the damage he complains of here, if he was damaged at all. Neither do we see how he could have suffered the damage he claims by reason of the taking possession by the sheriff of the property which he claims he was deprived of. He says all his property in the yard was attached. Being asked what that property consisted of, he says: " Blocks of marble, and one thing or another." But he can not tell how many, or what they were worth. Being asked how much property of his own was attached, he says he doesn't recollect. Asked whether it was worth $100, he says he can not tell without going into a measurement.

But his main cause of complaint is that the attachment prevented him from raising any money to carry on his business. We find another reason for it; it is that he did not pay his debts. If he had paid Lanata what he owed him, his credit would not have been impaired. It was the suit, not the attachment, which was a mere accessory to it, which injured him. Besides, he testifies that he kept the knowledge of the attachment from the men in his yard, and that they were not prevented from working by it. If his work went on, without regard to the attachment, we do not see how the attachment injured him.

All these facts we have taken from the testimony of the plaintiff, and we do not see from his own story of his wrongs that Lanata has caused him any damage, and we agree with the district judge that the verdict which gave him seven thousand dollars, was neither sanctioned by the evidence or authorized by the law.

It is therefore ordered, adjudged and decreed that the judgment of the lower court be avoided, annulled and reversed; and it is further ordered that there be judgment in favor of defendant with costs in both courts.